1

2

3

4

5

6

UNITED STATES DISTRICT COURT

7

FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9  GEORGE LUIS LOPEZ,                          Case No. 1:16-cv-01405-DAD-JDP (HC)

10          Petitioner,                         FINDINGS AND RECOMMENDATIONS
                                                THAT COURT DENY PETITION FOR
11      v.                                      WRIT OF HABEAS CORPUS

12  JOEL D. MARTINEZ,                           ECF No. 1

13          Respondent.                         OBJECTIONS DUE IN 14 DAYS

14

15          Petitioner George Luis Lopez, a state prisoner without counsel, seeks a writ of habeas

16  corpus under 28 U.S.C. § 2254. He claims ineffective assistance of counsel but has not shown

17  that he suffered prejudice as a result of his counsel's alleged errors. We recommend that the

18  court deny the petition.

19  **I.      Background**

20          Petitioner was charged with molesting two minors: T.Y. and J.M. He pleaded not guilty

21  and proceeded to trial. A jury found petitioner guilty of three counts of committing a lewd and

22  lascivious act against a child under the age of 14. Petitioner was sentenced to a prison term of

23  15 years to life.

24          We set forth below the facts of the underlying offenses, as stated by the California

25  Court of Appeal, Fifth District ("Court of Appeal"). A presumption of correctness applies to

26  these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th

27  Cir. 2015). All alterations come from the Court of Appeal's opinion.

28

**The Information**

The information charged Lopez with eight counts of violating section 288, subdivision (b)(1), committing a lewd or lascivious act on a child under the age of 14 through the use of force or fear. The victim in each count was T.Y. The ninth count of the information charged Lopez with violating section 288, subdivision (a), committing a lewd or lascivious act on a child under the age of 14. The victim in this count was J.M. Each count alleged Lopez was subject to a sentence of 15 years to life pursuant to section 667.61, subdivision (b) because the alleged crime is listed in subdivision (c)(4) of section 667.61 and because there were multiple victims as specified in subdivision (e)(4) of section 667.61. Counts four, five, six, eight and nine also alleged Lopez was statutorily ineligible for probation because there was substantial sexual conduct pursuant to the provisions of section 1203.066, subdivision (a)(8).

**Trial Testimony**

The testimony of the complaining witnesses was presented in three parts—police interview, child abuse response team (CART) interview, and trial testimony.

**T.Y.'s Testimony**

### Interview with Officer Joshua Peña

Officer Joshua Peña interviewed T.Y. at her elementary school shortly after her parents reported the molestation. T.Y. appeared calm during the interview, and she was able to distinguish between the truth and a lie. T.Y. told Peña that Lopez had touched her inappropriately the previous day. T.Y. explained that Lopez had picked her up, along with his daughter, from school and had taken them home. Mrs. Lopez came home at some point. Around 5:00 p.m. Mrs. Lopez and her daughter left the house, leaving T.Y. and Lopez at the home. T.Y. was watching television when Lopez joined her on the couch. T.Y. went to the bathroom. When she returned, Lopez maneuvered himself so that T.Y. ended up sitting on his lap. He then placed his hand under her shirt and bra, touching her breasts. T.Y. told Lopez she wanted to go outside to play, but he made excuses as to why she could not do so. T.Y. could not leave because Lopez had his arm around her waist. After approximately 10 to 15 minutes, Lopez let T.Y. go and she ran to the bathroom. When she returned to the living room, T.Y. sat on the couch. Somehow T.Y. again ended up sitting on Lopez's lap. This time Lopez placed his hand inside T.Y.'s pants, outside of her underwear. Lopez rubbed T.Y.'s private area. T.Y. asked Lopez to stop on three different occasions. Lopez let T.Y. go when her mother arrived.

During the interview, T.Y. said similar incidents had occurred on approximately two previous occasions, but she could not describe those incidents. T.Y. told Peña she did not report the contact sooner because Lopez was a long-time family friend.

## CART Interview

T.Y.'s CART interview occurred on February 1, 2006 (exh. 12A). T.Y. was 10 years old at the time of the interview. The interviewer confirmed that T.Y. knew what the truth was and told her it was important to tell the truth during the interview. T.Y. then explained what occurred on January 30, 2006. T.Y. stated she was friends with Lopez's daughter, M. Lopez had picked the girls up from school. Later that afternoon M. left for basketball practice with her mother. T.Y. was watching a movie when Lopez sat down with her.

T.Y. went to the bathroom. When she returned, she accidentally sat on Lopez's lap. Lopez put his hand up T.Y.'s shirt and felt her breast area. Lopez had one hand around T.Y.'s waist, so her efforts to get away initially were unsuccessful. T.Y. asked Lopez to stop several times. T.Y. finally got away and returned to the bathroom, where she stayed for five to 10 minutes.

When T.Y. returned she ended up on Lopez's lap again, although she was not sure how that occurred. This time Lopez put his hands down T.Y.'s pants for about five to 10 minutes. Lopez's hand was on top of T.Y.'s underwear. T.Y. was unsure what part of her anatomy Lopez was touching. T.Y.'s mother picked her up a short while later.

When asked whether this was the only time such an incident had occurred, T.Y. said similar incidents had occurred around four times before, although she could not provide any details of those other incidents, including when they had occurred or where Lopez had touched her. T.Y. did recall that after the first incident, Lopez told her to not tell anyone, which was why she kept quiet until she told her mother about the molestations the morning after the last incident. She believed three other incidents occurred when she was nine years old. T.Y. told her parents because she did not want to have to go through another incident.

## Interview with Detective Chris Jennings

T.Y.'s interview with Detective Chris Jennings occurred on October 27, 2011 (exh. 1A), which was five years after the initial report of the molestation. T.Y. explained that she would go to Lopez's house after school while her parents worked. She also explained that M. participated in various activities, and M.'s mother would take M., leaving T.Y. with Lopez until her mother picked her up.

The first incident recalled by T.Y. occurred when she was in the fourth grade. T.Y. enjoyed talking and wrestling with Lopez. The first incident occurred when T.Y. ended up on the floor as they were wrestling and her pants came unbuttoned. Lopez pulled her pants down and her shirt up, exposing T.Y., but he did not touch her. Lopez told T.Y. to not tell her parents and then gave her a chocolate bar as a bribe.

T.Y. could not recall any details of the other incidents that had occurred, except for the last incident, but told Jennings that the molestation happened repeatedly. The last incident occurred when T.Y. was sitting on the couch in Lopez's house. T.Y. was in the fifth grade. The incident occurred on the day before T.Y. reported the molestation. Lopez was watching television when T.Y. entered the room. Lopez told T.Y. to sit on his lap. Lopez put his hands underneath T.Y.'s shirt and touched her breast area. T.Y. went to the bathroom, where she stayed for a while. Eventually, T.Y. went back into the living room and again sat on Lopez's lap because she feared "repercussions" if she did not do so. Lopez placed one hand on T.Y.'s shirt and the other hand on her stomach. Lopez moved one hand down T.Y.'s pants near her vagina.

As she conversed with Jennings, T.Y. recalled an incident where she spent the night with M. During the night she woke up to find Lopez with his hand up her shirt.

T.Y. estimated Lopez had molested her approximately twice a week for two years. T.Y. would try to get away, but Lopez would hold onto her. T.Y. also would tell Lopez to stop, but without success. After the molestations, Lopez would give her candy. Defense counsel noted the transcript of the interview was inaccurate in several places.

**Trial Testimony**

T.Y. was 17 at the time she testified at trial. She had met Lopez through his daughter, M. T.Y. and M. were best friends through the fifth grade. While in grade school, T.Y.'s mother usually dropped her off at school and Lopez would pick her up and either take her to his house with M. or take her to her grandmother's house. Usually the girls did homework or watched television after school. T.Y.'s mother would pick her up on her way home from work.

Lopez first touched T.Y. inappropriately when she was in the third grade. M. had gone somewhere with her mother. Lopez was playing with T.Y. when her pants accidentally came unbuttoned. When T.Y. went to button them, Lopez said, "Don't." Lopez then pulled down her pants and underwear and pulled her shirt up. After a short time he pulled the shirt down and the pants up and apologized to her. He did not touch her that time. Lopez told T.Y. to not tell her parents and then bribed her with a candy bar.

Another incident occurred while T.Y. was doing homework on M.'s bed. T.Y. thought she was probably in the fourth grade. While T.Y. was doing her homework, Lopez came into the room and lay on the bed with her. He was talking to T.Y. about how someday someone would kiss her. When Lopez got up to leave the room, he kissed T.Y. on the lips.

Another instance occurred when T.Y. spent the night with M. The two were asleep in M.'s bed. T.Y. woke up to find Lopez with his hand up her shirt. T.Y. pretended to be asleep, and Lopez soon

left.  This occurred when T.Y. was approximately nine or 10, the same age as the previous incident.

The last incident occurred when T.Y. was in the fifth grade.  Lopez picked up T.Y. and M. after school.  M. and her mother then left for an activity.  T.Y. initially was doing homework.  When she came into the living room, she had a feeling Lopez would touch her, so she went into the bathroom and hid, hoping her mother would arrive to take her home.  When she came out, Lopez told T.Y. to sit on his lap.  T.Y. complied.  Lopez put one hand up T.Y.'s shirt and touched her breast and one hand down her pants and touched her vagina.  T.Y. was able to get away when Lopez allowed her to go play with the dog.  The next morning T.Y. told her mother about the incident.

While T.Y. was not able to recall any other specific incidents where Lopez had touched her inappropriately, she did recall he had done so on a regular basis from approximately the third grade onward.  T.Y. testified she believed Lopez had touched her vagina more than five times during this period.

T.Y. did not tell her parents before the last incident because Lopez told her to not do so, and she was afraid of being judged or blamed for the incidents.

**J.M.'s Testimony**

### Police Interview

The prosecutor played to the jury the statement J.M. gave to police officers on September 25, 2011 (exh. 15A).  In this statement the officer first confirmed that J.M. knew the difference between the truth and a lie.  The officer next asked J.M. if there were areas where she should not be touched.  J.M. indicated she should not be touched on her vaginal area or on her buttocks, although it was difficult to be sure from the transcript of the interview.

The officer asked J.M. what she would do when she visited her aunt.  She said she would play with Lopez's daughter, M. J.M. initially denied playing with a computer and denied Lopez had done anything to make her feel bad.  J.M. also indicated that no one had touched her in places she should not have been touched.  J.M. stated she was not afraid of her aunt and uncle.  The following colloquy then occurred.

OFFICER: I was . . . talking to your mom and your mom said that . . . you told her that someone touched you in your foof.

[J.M.]: It was nino George.

OFFICER: It was nino George?  Yeah?  Okay.  Why did he touch you there?

[J.M.]: I don't know.

OFFICER: You don't know?  Did he touch you when he had your—your [underwear] on?  Or did he touch you underneath your [underwear]?

[J.M.]: He touched me and I had my [underwear].

OFFICER: On? Okay. Did—what—what did he tell you when he did that?

[J.M.]: Nothing.

J.M. then explained that she was with Lopez in "the room" playing games on Lopez's computer.  M. was in her room, and J.M.'s mother and two aunts were in the kitchen cooking.  This was the only time Lopez touched her vagina.

### CART Interview

J.M.'s CART interview also was played for the jury (exh. 2A).  In the relevant portions of this interview, J.M. confirmed she was four years old and had five sisters.  She described her family, including the family pets.  J.M. initially denied anything had happened to her that she wanted to talk about.  When asked if anyone had hurt her or had done anything to her, she stated that the kids at school hit her occasionally.

The interviewer then directed the conversation to good and bad touches.  J.M. knew the difference between good touches (hugs and kisses) and bad touches (being hit or pinched).  J.M. denied knowing about "secret touches"—where someone would touch J.M. where they were not supposed to and then tell J.M. to keep it a secret.  The following colloquy then occurred:

[INTERVIEWER]: No?  Um, have you—has anyone ever touched you where they're not supposed to?

[J.M.]: (Inaudible).

[INTERVIEWER]: Is that a yes or a no?

[J.M.]: Mm-hmm.

[INTERVIEWER]: Mm-hmm?  Okay.  Well, who's touched you where they're not supposed to?

[J.M.]: Um, um, right here.

[INTERVIEWER]: Right there?

[J.M.]: Mm-hmm.

[INTERVIEWER]: Okay.  Well, did you know that we all have private places?

[J.M.]: Mm-hmm.

[INTERVIEWER]: And private parts on our body that other people aren't supposed to touch?  Did you know that?

[J.M.]: Uhn-uhn.

The interviewer next produced a diagram of a girl and had J.M. identify the various body parts.  The interviewer asked J.M. if anyone had touched her on certain parts of her body (eyes, mouth, and belly button) and then asked:

[INTERVIEWER]: No?  What about on your foof?  Has anybody tried to touch you on your foof?

[J.M.]: Uhn-uhn.

[INTERVIEWER]: Has anybody ever asked if they could touch your foof or tried or—or . . .

[J.M.]: The police told me that's not where you touch people.

[INTERVIEWER]: The police told you that?

[J.M.]: Mm-hmm.

[INTERVIEWER]: How—why did you talk to the police?

[J.M.]: Um, 'cause (inaudible) person touched that and the butt.

[INTERVIEWER]: One person touched that and the butt?

[J.M.]: No. Somebody—Uncle Nino, he touches me on the foof.

[INTERVIEWER]: Your Uncle Nino touches you on the—on the foo-foos?

[J.M.]: Mm-hmm.

[INTERVIEWER]: So he did it one time or more than one time?

[J.M.]: One time.

[INTERVIEWER]: One time?  Can you tell me exactly what he did when that happened?

[J.M.]: We were playing a Barbie Girl game on his computer and he touches me when I need help on my foofies.

[INTERVIEWER]: Okay.  So were you on the computer?  Were you sitting at the computer when he touched you on your foof?

[J.M.]: Mm-hmm.

[INTERVIEWER]: Okay.  Was there anybody else with you?

1   [J.M.]: Um, no.  Just Nino.

2   [INTERVIEWER]: Just Nino?

3   [J.M.]: Mm-hmm.

4   [INTERVIEWER]: Were you at his house on his computer?

5   [J.M.]: Mm-hmm.

6   [INTERVIEWER]: Or somewhere else?

7   [J.M.]: At Nino's house.

8   [INTERVIEWER]: And you said you needed help on it?

9   [J.M.]: Mm-hmm.

10  [INTERVIEWER]: And what did you need help with?

11  [J.M.]: I tried to put tried to make with the computer stuff and
12  (inaudible) cookies.

    [INTERVIEWER]: Okay. So . . . did you ask Nino for help?
13
    [J.M.]: Mm-hmm.
14
    [INTERVIEWER]: What did you say when you asked him for
15  help?  What did you tell him?

16  [J.M.]: I get off the chair and I get to go get Nino and he was
    coming with me and then he tried to stop it but I can't.  And so—
17
    [INTERVIEWER]: He—you tried to stop him but you can't?
18
19  [J.M.]: Uhn-uhn. (Inaudible) said stop.

20  [INTERVIEWER]: What—what were you trying to stop?

21  [J.M.]: Him touching my foof.

22  [INTERVIEWER]: How did he touch it?

23  [J.M.]: Um, right there.

24  [INTERVIEWER]: What did he touch it with?

25  [J.M.]: His, um, hand.

26  [INTERVIEWER]: His hand?

27  [J.M.]: Mm-hmm.

    [INTERVIEWER]: Did his hand stay on top of your clothes like
28  this?  Or did it go inside, underneath?

[J.M.]: Inside.

[INTERVIEWER]: Inside?

[J.M.]: Mm-hmm.

[INTERVIEWER]: What were you wearing when he touched your foof? Do you remember what clothes you had on?

[J.M.]: I had, um, (inaudible) shirt and shorts.

[INTERVIEWER]: And shorts?

[J.M.]: Mm-hmm.

[INTERVIEWER]: Did you have anything on underneath your shorts?

[J.M.]: Um, [underwear].

[INTERVIEWER]: [Underwear]?

[J.M.]: Mm-hmm.

[INTERVIEWER]: So when Nino touched your foof did he touch you on your [underwear]?

[J.M.]: No.

[INTERVIEWER]: Or did he touch you on your skin?

[J.M.]: Inside my [underwear].

[INTERVIEWER]: Inside your [underwear]?

[J.M.]: Mm-hmm.

[INTERVIEWER]: What did that feel like when he touched your foof? What did it feel like to your foof?

[J.M.]: I don't know.

[INTERVIEWER]: Um, when he had his hand on your foof did he move his hand around or did he just keep it still?

[J.M.]: Just kept it still and he took it out.

[INTERVIEWER]: Did he say anything when he—when he touched your foof?

[J.M.]: I was going to ask him something and (inaudible) but he won't.

[INTERVIEWER]: Did you say anything to him when he touched

your foof?

[J.M.]: Mm-hmm.

[INTERVIEWER]: What'd you say?

[J.M.]: Um, I said stop.

[INTERVIEWER]: Did he stop when you told him to stop?

[J.M.]: Uhn-uhn.

[INTERVIEWER]: Did he say anything back to you?

[J.M.]: Hmm—

[INTERVIEWER]: Did he answer you?

[J.M.]: He answered me but, um, he was trying to look on the computer for a different game.

[INTERVIEWER]: How did he answer you?

[J.M.]: Um, he didn't answer me.

[INTERVIEWER]: Okay. Has—has he ever done that before?

[J.M.]: (Inaudible.)

[INTERVIEWER]: Or was that the only time?

[J.M.]: That was the only time.

The interview continued for a short while confirming the above constituted the relevant facts. The interviewer also confirmed J.M.'s account by asking, "You said earlier that he touched your foof and your butt. Is that right or did I get that wrong?" J.M. replied, "No, you get it wrong. He only touched my foofie." When the interviewer asked when the incident occurred, J.M. replied, "Um, yesterday. He touched my foofies." J.M. also stated she was currently four years old and that the incident occurred when she was three. The interviewer confirmed that J.M. knew the difference between the truth and a lie, but she did not ask J.M. if she had been truthful throughout the interview.

### Trial Testimony

J.M. testified. She could not identify Lopez. She denied anyone had touched her vagina and denied telling her mother or a police officer that someone had done so.

### Law Enforcement Testimony

Peña interviewed Lopez after he interviewed T.Y. Lopez denied anything inappropriate occurred with T.Y.

Jennings interviewed Lopez regarding the allegations made by J.M. Lopez admitted that J.M. came to his house regularly, and he played with her when she was there. He also admitted that J.M. played on his computer, and he assisted her at times. He denied that J.M. ever sat on his lap while playing on the computer and denied ever having inappropriate contact with J.M. Lopez suggested the whole incident may have been a "misunderstanding or a family issue."

Jennings testified that during the CART interview, J.M. could distinguish between the truth and a lie, but she never was instructed to tell the truth during the interview. J.M. was not asked (1) if a lie was bad, (2) if she would be punished if she told a lie, (3) if she would not be punished if she told the truth, (4) if she would get into trouble if she lied, or (5) if her mother had told her to tell the truth.

Lopez's computer was seized and searched, but nothing of evidentiary value was found on it.

### Witness Testimony

Michelle M. testified she is Lopez's niece. J.M. is her younger sister. She confirmed that Lopez would pick her up from school, along with M. and T.Y. She also confirmed that Lopez's wife, Delores, would take her and M. to dance and volleyball classes and T.Y. would stay at the Lopez home with Lopez.

Michelle also recalled a day when her parents were very upset and an officer came to their house. Michelle asked what had happened, and her father told her that Lopez had touched J.M. Michelle asked J.M. what had happened. J.M. stated she had been sitting on Lopez's lap while playing on the computer and Lopez touched her vagina inside of her shorts.

M.R. is J.M. and Michelle's mother. Lopez's wife is M.R.'s aunt. M.R. related that in 2011 J.M. told her that Lopez had touched her inappropriately. J.M. was four at the time. M.R. was working on her computer when J.M. came into the room. The two began talking and J.M. asked M.R. why she had given her a hug. M.R. explained about good and bad touches and told J.M. that no one should ever touch her "privates." That was when J.M. said that Lopez had done so when J.M. was playing on the computer. J.M. said she was sitting on Lopez's lap when Lopez touched her vagina inside of her shorts. M.R. then called the police and reported the incident.

M.R. heard about the allegations made by T.Y. against Lopez in 2006 when the police interviewed Michelle. M.R. was told by either Lopez or his wife that the allegations were the result of a misunderstanding. Since Lopez was not prosecuted at the time, M.R. believed the allegation was a misunderstanding.

M.R. also admitted Lopez had loaned her money in the past, but

claimed she did not have any issues with Lopez before she learned of J.M.'s allegation.

T.Y.'s mother explained that her family had become friends with Lopez's family because their daughters became school friends beginning in kindergarten. Eventually, T.Y.'s mother began taking both girls to school in the mornings, and Lopez would pick them up from school in the afternoons. Lopez would then babysit until T.Y.'s mother ended her work day, usually between 5:30 and 5:45 p.m. This arrangement continued until T.Y. told her mother she was being molested by Lopez.

On the morning of January 31, 2006, T.Y.'s mother was lying in bed when T.Y. came into the room and asked if she (T.Y.'s mother) had ever been verbally, physically, or sexually abused. Mother became concerned and T.Y. explained that she had been molested by Lopez. Mother did not ask many questions because she wanted the police to investigate without her interference. Later that morning Lopez dropped off his daughter so T.Y.'s mother could take both girls to school. While at the house, Lopez whispered something to T.Y. that her mother could not hear, which was found to be a bit unusual by T.Y.'s mother. After dropping the girls off at school, T.Y.'s parents went to the police station to report the molestation.

T.Y.'s father testified in a manner similar to T.Y.'s mother's testimony in all relevant areas.

**Defense Evidence**

Kathy Bates testified she had known Lopez for over 30 years, and she had never seen him act inappropriately with a child, and, in her opinion, he would not do so.

Kathy Bates's daughter testified she had known Lopez her entire life, and he had never acted inappropriately around her. She also opined that Lopez would not act inappropriately with children.

Catalina L. a friend of M.'s, testified that Lopez never acted inappropriately with her. Nor, in her opinion, would he ever do so with other children.

Michaella H. lived in the same neighborhood as Lopez in her youth. She first became friends with M. and later the whole family. She testified that Lopez was more of a father to her than her own father, and that she thought the world of him. Lopez never touched her inappropriately, and, in her opinion, he would not touch anyone inappropriately.

Lopez's brother, Freddie Lopez, provided some background information about Lopez. He testified that he had never seen Lopez act inappropriately around children. Nor, in his opinion, would Lopez do so.

Lopez's wife, Delores, denied that during the relevant time periods

she ever left the home to run errands. Delores also claimed that she often took T.Y. to T.Y.'s mother's place of work when she (Delores) took M. to her activities. Delores testified that she was always either at home with T.Y. and M. or she would take T.Y. to her mother's place of employment when she took M. to an activity. According to Delores, T.Y. was never at home alone with Lopez. Lopez never asked Delores to leave T.Y. at home with him when she took Marissa to an activity, nor did Lopez ever take T.Y. any place by herself. T.Y. never gave an indication she was uncomfortable at the Lopez house or did not want to be there, nor did T.Y. ever appear to be avoiding Lopez.

Delores claimed that shortly before T.Y. made the accusations, T.Y.'s mother became pregnant with twins, and this upset T.Y.

On the day T.Y. alleged she was molested by Lopez, Delores found M., T.Y., and Lopez at home when she returned from work. M. had basketball practice at 6:00 p.m. Delores left at approximately 6:00 or 6:10 p.m. to take M. to basketball practice, leaving T.Y. with Lopez. This was the only time Delores ever left T.Y. with Lopez.

Delores never saw Lopez act inappropriately with any children. Nor, in her opinion, would he ever do so.

Delores also admitted that J.M. would come to visit at her house on a fairly regular basis. J.M. spent most of the time with M. Lopez never asked to have J.M. brought to the house. Lopez was there at times, and Delores would see Lopez helping J.M. on the computer. However, J.M. never sat on Lopez's lap while he was helping her on the computer.

J.M.'s mother, M.R., asked to borrow money from the Lopezes in early 2011 on at least two occasions. The Lopezes loaned her over $2,000. However, when M.R. asked to borrow over $4,000 in August, Lopez refused to do so. M.R. became upset.

M. testified in a manner consistent with her mother's testimony about J.M.'s visits to the Lopez house. She also testified in a manner consistent with her mother's testimony about T.Y.'s visits to the Lopez house.

M. never saw her father do anything that made her feel uncomfortable around T.Y. or any other child. She never saw T.Y. avoid Lopez, nor did T.Y. say she did not want to come over to her house. M. confirmed that the only time T.Y. was alone with Lopez was on the day of the last alleged incident.

Lopez's sister-in-law, M.R. Nicacio, testified that she had never seen Lopez act inappropriately with children, and, in her opinion, he would never do so.

Sanjeer Dheri is the store manager of a local chain drug store at which T.Y. used to work. T.Y. resigned after an investigation was started into whether she was stealing from the company. T.Y. was

purchasing items that were delineated as "register reward" items. Register rewards essentially are a coupon that is received when an item is purchased and the coupon can be used for future purchases. T.Y. would then return the purchased items to another store but retain the coupon, which the company considered stealing. When she was confronted, T.Y. stated she no longer wished to be employed or be a burden to the store and resigned. T.Y. claimed she did not believe what she was doing was wrong.

### Closing Arguments, Verdict, and Sentencing

The prosecution relied on T.Y.'s testimony to assert Lopez was guilty of each charged crime and enhancement. Defense counsel argued there was insufficient evidence to support any count, noting the inconsistencies between the statements made by T.Y. and J.M. and their trial testimony. Defense counsel also argued that the failure to ask J.M. if she told the truth throughout her recorded interview rendered the interview unreliable.

After several days of deliberations, the jury found Lopez guilty of counts seven, eight, and nine. Counts seven and eight were the last incident perpetrated on T.Y. that occurred on January 30, 2006. Count nine involved the incident involving J.M. In addition to finding Lopez guilty of these charges, the jury found the multiple victim allegation true for each count, and found true that there was substantial sexual conduct related to count eight. The jury could not reach a verdict on the remaining counts, which eventually were dismissed.

The trial court sentenced Lopez to a term of 15 years to life on each count, with the sentences on counts seven and eight imposed concurrently to the sentence on count nine.

*People v. Lopez*, No. F067545, 2015 WL 7306257, at \*1-9 (Cal. Ct. App. Nov. 19, 2015).

## II. Discussion

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See* § 2254; *Harrington v. Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003). To decide a Section 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The standard that governs our review of the state court's decision depends on whether the state court adjudicated petitioner's claims on the merits.

When a state court has adjudicated a petitioner's claims on the merits, a federal court reviews the state court's decision under the deferential standard of Section 2254(d). Section 2254(d) precludes a federal court from granting habeas relief unless a state court's decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts. *See* § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted). The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016). A federal habeas court has an obligation to consider arguments or theories that "could have supported a state court's decision." *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2557 (2018) (quoting *Richter*, 562 U.S. at 102). One rule applies to all state prisoners' petitions adjudicated on the merits: the petitioner must show that the state court's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Even when a state court does not explicitly address a petitioner's claims on the merits, a Section 2254 petitioner must satisfy a demanding standard to obtain habeas relief. When a state court gives no reason for denying a petitioner's habeas claim, a rebuttable presumption arises that the state court adjudicated the claim on the merits under Section 2254(d). *See Richter*, 562 U.S. at 99. And a federal habeas court's obligation to consider arguments or theories that could support a state court's decision extends to state-court decisions that offer no reasoning at all. *See Sexton*, 138 S. Ct. at 2557.

If a state court denies a petitioner's habeas claim solely on a procedural ground, then Section 2254(d)'s deferential standard does not apply, *see Visciotti v. Martel*, 862 F.3d 749, 760 (9th Cir. 2016), but the petitioner faces another hurdle: if the state court's decision relies on a state procedural rule that is "firmly established and regularly followed," the petitioner has procedurally defaulted on his claim and cannot pursue habeas relief in federal court unless he shows that the federal court should excuse his procedural default. *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016); *accord Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016). If the petitioner has not pursued his habeas claim in state court at all, the claim is subject to dismissal for failure to exhaust state-court remedies. *See Murray v. Schriro*, 882 F.3d 778, 807 (9th Cir. 2018).

If obtaining habeas relief under Section 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102. As the Supreme Court has put it, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id.* at 103 (citation omitted). Our habeas review authority serves as a "guard against *extreme* malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (emphasis added).

Here, petitioner raises two habeas claims: (1) petitioner received ineffective assistance of counsel because his trial counsel failed to object to the admission of certain prior statements made by one of the victims, J.M.; and (2) petitioner received ineffective assistance of counsel because his trial counsel failed to introduce evidence that J.M. had habits of touching her private areas and that J.M. had inappropriately touched another child. The Court of Appeal rejected both claims on the merits in a reasoned opinion. The California Supreme Court summarily denied review.

Both claims of ineffective assistance of counsel are governed by the same standard: A "doubly" deferential standard governs a habeas petitioner's claim of ineffective assistance of counsel. *See Richter*, 562 U.S. at 105. On direct appeal, the two-step inquiry from *Strickland*

*v. Washington* guides the analysis for an ineffective-assistance-of-counsel claim. *See* 466 U.S. `

668, 687 (1984). Under *Strickland*, a criminal defendant first must show a deficiency in

performance by counsel that is "so serious that counsel was not functioning as the counsel

guaranteed the defendant by the Sixth Amendment." *Id*. Second, the defendant must show

that the deficient performance caused him prejudice; this requires him to show "that counsel's

errors were so serious as to deprive [the petitioner] of a fair trial." *Id*. On habeas review, the

*Strickland* requirements become even more deferential since they are coupled with

Section 2254(d)'s fairminded jurist standard: the question becomes "whether there is *any*

reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562

U.S. at 105 (emphasis added). That is, if there is even one reasonable argument that counsel

did not violate the *Strickland* standard—even if the state court has not identified the

argument—the petitioner cannot obtain habeas relief. *See id*. at 106.

### a. Failure to Object to Admission of J.M.'s Prior Statements

On the first day of trial, the government filed a motion in limine to admit various

statements made by J.M. during her CART interview, conversations with her parents, and

interviews with police officers. The trial court granted the government's motion. On appeal,

petitioner argued that he received ineffective assistance of counsel because his attorney failed

to object to the admission of J.M.'s statements. Specifically, petitioner argued that the

government had not shown sufficient indicia of reliability in a hearing outside the presence of

the jury. *See* Cal. Evid. Code § 1360(a)(2). The Court of Appeal reasoned that, even if the

attorney had objected, the trial court would have overruled the objection. In this habeas

proceeding, petitioner repeats his argument that his trial counsel should have objected to the

admission of J.M.'s prior statements.

Petitioner's claim fails for two reasons. First, a challenge to J.M.'s lack of reliability

would have been futile. *See Jones v. Ryan*, 691 F.3d 1093, 1101 (9th Cir. 2012) (reasoning

that failure to raise futile argument does not show prejudice). After the trial began but before

the examination of J.M., petitioner's trial counsel moved to exclude all statements from J.M.

and to disqualify J.M. as a witness.  CT 2:408-09, 411-12.[1]  The attorney argued, *inter alia*, that J.M. could not distinguish between truth and falsity or perceive and recollect events about which she would testify.  CT 2:411-13.  He also argued that J.M.'s youth and cognitive development precluded her from perceiving, remembering, or communicating her personal knowledge.  CT 2:411.  The court deferred ruling on the motion, and when petitioner's trial counsel argued again that J.M.'s statements should be excluded on a motion for entry of judgment of acquittal, the trial court found sufficient indicia of reliability:

> The most telling part for me, first of all, as to competency, and second of all that the jury can rely on the CART interview.  As I recall towards the end of that interview, the interviewer asked J.M., "Am I wrong that you said that you were touched on your foof and on your bottom?"  And J.M. responded and said, "You are wrong.  It was only my foof," I'm paraphrasing, but not my butt.  And I thought that was very enlightening and proof that this four-year-old would not be led, number one, by the interviewer saying, "Yeah, you're right it was both."  Number two, she said, "No, you are wrong.  I was just saying it was my foof."  So I think she's competent enough and I think it's sufficient to be affirmed on appeal if the jury wants to believe that.

RT 2:365-67.  The Court of Appeal considered this statement by the trial court as a finding of sufficient indicia of reliability and agreed with the trial court.  *See Lopez*, 2015 WL 7306257, at *10.  We now hold that, if petitioner's trial counsel had raised an objection under Section 1360, a reasonable jurist could find that the trial judge would have found sufficient indicia of reliability, rendering the objection futile.

Second, the Court of Appeal noted that, in addition to California Evidence Code Section 1360, another exception to the hearsay rule, California Evidence Code Section 1235, made J.M.'s prior statements admissible.  *See Lopez*, 2015 WL 7306257, at *10; *accord* Cal. Evid. Code §§ 770, 1235.  Section 1235 allows admission of prior inconsistent statements.  *See Cal. Evid. Code §§ 770, 1235.  Petitioner does not deny that J.M.'s statements were admissible

---

[1] All "CT" citations refer to the clerk's transcript.  All "RT" citations refer to the reporter's transcript.  Both the clerk's transcript and to the reporter's transcript have been lodged with the court.

under Section 1235, but he argues that, if J.M.'s statements were admitted under Section 1235 `

rather than Section 1360, the order in which the jury heard the testimony of witnesses would

have been different. *See* ECF No. 1 at 13. Jurors are presumed to be "intelligent persons."

*People v. Martin*, 78 Cal. App. 4th 1107, 1111 (2000). We conclude that a reasonable jurist

could find that, even if the order in which the evidence was presented had been changed, the

outcome of the trial would have been the same.

We need not reach the merits of petitioner's claim, but it does not appear that petitioner

could prevail on the merits. Under California law, Evidence Code Section 1360 is an

exception to the hearsay rule and allows, in a criminal prosecution, admission of out-of-court

statements of a minor victim describing any act or attempted act of child abuse if (1) the

statement is not otherwise admissible by statute or court rule; (2) the court finds, in a hearing

conducted outside the presence of the jury, that the time, content, and circumstances of the

statement provide "sufficient indicia of reliability"; and (3) either the victim testifies at the trial

or is unavailable as a witness and there is evidence to corroborate the victim's statement. *See*

Cal. Evid. Code § 1360; *see also In re Cindy L.*, 17 Cal. 4th 15, 28 n.7 (1997).[2] This case

concerns the second requirement, indicia of reliability.

To evaluate whether there are sufficient indicia of reliability, a California state court may

consider five non-exclusive factors: (1) spontaneity and consistent repetition; (2) mental state

_____

[2] Applying Section 1360's exception to the general hearsay rule does not, by itself, violate
federal law in this case. *See Brodit v. Cambra*, 350 F.3d 985, 989 (9th Cir. 2003) (denying
habeas relief and reasoning that application of Section 1360 does not violate habeas petitioner's
right to raise defense). In *Crawford v. Washington*, the Supreme Court held that out-of-court
statements by witnesses that are testimonial are barred under the Confrontation Clause unless
witnesses are unavailable and the criminal defendants had prior opportunity to cross-examine
witnesses, regardless of whether such statements are deemed reliable by court. 541 U.S. 36, 53
(2004). The Supreme Court, however, "reiterate[d] that, when the declarant appears for cross-
examination at trial, the Confrontation Clause places no constraints at all on the use of his prior
testimonial statements. It is therefore irrelevant that the reliability of some out-of-court
statements cannot be replicated, even if the declarant testifies to the same matters in court. The
Clause does not bar admission of a statement so long as the declarant is present at trial to defend
or explain it." *Id.* at 59 n.9. Because J.M. testified at trial, this case does not raise a *Crawford*
issue.

19

of the declarant; (3) use of terminology unexpected of a child of similar age; (4) lack of motive to fabricate; and (5) whether the child understands the difference between the truth and a falsehood. *See In re Lucero L.*, 22 Cal. 4th 1227, 1239 (2000); *In re Cindy L.*, 17 Cal. 4th at 28-29 (citing *Idaho v. Wright*, 497 U.S. 805, 821-22 (1990)). Ordinarily, "violations of state law are not cognizable on federal habeas review." *Rhoades v. Henry*, 611 F.3d 1133, 1142 (9th Cir. 2010). Absent an error "so arbitrary or capricious as to constitute an independent due process," *Lewis v. Jeffers*, 497 U.S. 764, 765 (1990), a federal court will not grant habeas relief on an issue of state law, *Smith v. Ryan*, 823 F.3d 1270, 1282 n.8 (9th Cir. 2016).

Here, we cannot conclude that the Court of Appeal's decision on Section 1360 was so arbitrary or capricious—indeed we are not convinced that it was an error at all. Although J.M. did not report her molestation when it occurred, she did so as soon as she learned about inappropriate touching from her mother. At some point, J.M.'s mother, M.R., explained about good and bad touches, telling J.M. that no one should ever touch her "privates"; that was when J.M. said that petitioner had touched her inappropriately. *See Lopez*, 2015 WL 7306257, at *7. Later, when J.M. told the CART interviewer that petitioner had touched her inappropriately, the interviewer did not solicit J.M.'s identification of petitioner as the perpetrator:

> [INTERVIEWER]: How—why did you talk to the police?
>
> [J.M.]: Um, cause (inaudible) person touched that and the butt.
>
> [INTERVIEWER]: One person touched that and the butt?
>
> [J.M.]: No. Somebody—*Uncle Nino*, he touches me on the foof.
>
> [INTERVIEWER]: Your Uncle Nino touches you on the—on the foo-foos?
>
> [J.M.]: Mm-hmm.

CT 2:326 (emphasis added). At least some evidence supports the finding that J.M. could distinguish the truth and a falsehood, as the trial court noted:

> [INTERVIEWER]: You said earlier that he touched your foof and your butt. Is that right or did I get that wrong?
>
> [J.M.]: No, you get it wrong. He only touched my foofie.

CT 2:326.  J.M., a child, had no identified motive to lie.[3]  Other factors—including J.M.'s mental state and her use of terminology unexpected of a child of similar age—weigh neither in favor nor against finding J.M.'s statement reliable.

Although petitioner does not raise a claim of actual innocence, we have considered whether such a claim could succeed.  This may have been a close case for the jury.  At trial, J.M., a key witness for the government, denied that anybody had touched her vagina and denied telling either her mother or a police officer that someone had done so.  *See* RT: 2:298-306.  The jury had to decide whether to credit J.M.'s prior statements or her trial testimony.  That decision, however, was for the jury.  Enough evidence supported the outcome.  This court, several steps removed from the factfinding process, cannot find that petitioner's claim meets the demanding standard set by Section 2254, and we cannot recommend that the court grant habeas relief here.

### b.  Failure to Introduce Evidence

J.M.'s mother obtained daycare for J.M. at a local YMCA after the incident with J.M. Outside the presence of the jury, petitioner's counsel informed the trial court that he intended to call a teacher from the YMCA who would testify that J.M. frequently put her hands down her pants, touching her vagina.  There also were two alleged incidents where J.M. inappropriately touched another child's buttocks at the YMCA.  The trial court understandably expressed doubt that this evidence would support petitioner's defense, stating, "The clear implication is that she's been molested so she does that sort of thing"—but the court did not prohibit petitioner's attorney from presenting evidence on that topic.  RT 2:181.  Petitioner's counsel did not bring up the subject at trial.  In this habeas proceeding, petitioner contends that

---

[3] Petitioner contends that J.M. had a motive to lie because J.M.'s mother was angry that petitioner decided not to loan her money.  The record, however, contains no evidence that J.M., a child, knew about what happened between petitioner and J.M.'s mother or had been encouraged by her mother to lie.

his trial counsel was ineffective in failing to introduce the evidence of J.M.'s habits as allegedly observed at the YMCA.

Petitioner argues that the evidence on J.M.'s alleged habits could have affected the outcome of his trial. He states:

> As we see it, the sequence of events was that Petitioner did not have contact with J.M. after August 2011. On September 25, 2011, J.M. told [her mother] that [petitioner] touched her inappropriately. All the other reports of molestation occurred after the initial report to Rosillo. However, J.M.'s inappropriate touching of other children at the YMCA occurred in December 2011 and January 2012. Therefore, defense counsel wanted to use the YMCA evidence to suggest that J.M. was molested by someone other than [p]etitioner, and that she was simply confused or mistaken when she told people that Petitioner touched her inappropriately. While the Court of Appeal searched for a "rational explanation for not introducing this evidence," counsel actually wanted to introduce this evidence. However, counsel mishandled this issue, and therefore, this potentially meritorious defense evidence was never heard by the jury.

ECF No. 1 at 17. This is speculation at best; we do not see how the evidence of J.M.'s habits would have affected the outcome of petitioner's trial. The Court of Appeal did not err when it stated that petitioner's argument "defie[d] logic," *Lopez*, 2015 WL 7306257, at *13, and this court should not grant habeas relief on this claim.

## III. Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."

1 | *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

2 |      Here, petitioner has not made a substantial showing of the denial of a constitutional right.

3 | Thus, the court should decline to issue a certificate of appealability.

4 | **IV.   Findings and Recommendations**

5 |      We recommend that the court deny the petition for a writ of habeas corpus, ECF No. 1,

6 | and decline to issue a certificate of appealability.

7 |      These findings and recommendations are submitted to the U.S. District Court Judge

8 | presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of

9 | Practice for the United States District Court, Eastern District of California.  Within 14 days of

10 | the service of the findings and recommendations, petitioner may file written objections to the

11 | findings and recommendations with the court and serve a copy on all parties.  That document

12 | must be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The

13 | District Judge will then review the findings and recommendations under 28 U.S.C.

14 | § 636(b)(1)(C).

15 |

16 | IT IS SO ORDERED.

17 |

18 | Dated:    April 2, 2019                      UNITED STATES MAGISTRATE JUDGE

19 |

20 |

21 |

22 | No. 202

23 |

24 |

25 |

26 |

27 |

28 |